Good morning. My name is Mark LaForestier. I represent Governor Schwarzenegger and the State of California in this appeal. When Congress passed the Indian Gaming Regulatory Act, it did so with the assumption that Indian gaming and non-Indian gaming would be competing. And that is the impetus for the good faith negotiation requirement. The idea was to ensure that the state would come to the negotiating table in good faith to negotiate with tribes where it might not have an economic incentive to do so, where it might be otherwise operating under a protectionist paradigm. When Proposition 1A was passed, it completely changed that paradigm, flipped it on its head. Because all of a sudden, tribal gaming in California, conducted pursuant to a compact, is conducted under an exclusive gaming regime. Here, the state has nothing but incentive to come to the negotiating table. And it changes, really, the nature of what it means to be in bad faith. Now, the tribe's argument, as we understand it, is that when the state comes to the bargaining table with the intention of reaching agreement and does so in a manner that advances the state's governmental interests, as Congress intended it to do under IGRA and the negotiating requirement, it is acting in bad faith. And we would submit that that is a notion of bad faith that is anathema to the congressional intent. Now, there are three principal issues I'd like to try to get to today. The first concerns Proposition 1A and what it means and what the voters' intention was. As the Court is aware, we have a motion pending before it to certify a question to the California Supreme Court, which is essentially, in its essence, did Proposition 1A establish the right to exclusive gaming, or did it establish an opportunity for tribes to seek exclusive gaming through negotiating compacts with the state? Well, for purposes of this case, is it not correct that the, I'll call it, Coyote 2 case, which seems to be the center of all discussion in this case, that the great consideration that was given in that case and which permitted our court to bless the compact was that there was a huge benefit provided to the five tribes and, of course, indirectly to other tribes, because they then had the right, which they did not have before, to conduct this type of gaming because of an amendment to the Constitution, which was proposed and sponsored by the governor's office and those who were negotiating with them. Isn't that a valid statement? I'm a little confused by reference to the five tribes, which is, I think, typically... Well, five tribes were involved in Coyote 2, right? That was the question of whether or not their agreement to share revenues with the state, whether that was a legitimate thing to do in light of the act. Right. By the time this Court considered the Coyote Valley case, only Coyote Valley was involved. Okay. All right. I think there were five tribes involved. Originally. That's correct. I'd forgotten that. Do you agree with that? Well, I think that what the... That's what the meaningful concession was in that case. The meaningful concession is interesting. There really was no fiscal benefit to the state as a result of the 1999 compacts. The Revenue Sharing Trust Fund, which the Coyote Valley case addressed... All the more to the point that the tribes are making that under the terms of the act, the tribes were the ones that are supposed to benefit. Correct. The state's supposed to get some money if it wants for environmental purposes and to help take care of the zoning and highways and other things related to going back and forth at the beginning. The state did get some benefit, some revenue-sharing benefits under this pact. But at the same time, the tribes got a huge benefit. Without this constitutional amendment, we wouldn't be having this discussion. That's correct. It would have been off the board. That's correct. In that case, at least from this judge's perspective, Coyote Valley, too, rises and falls on that constitutional amendment. There's not much else that you get out of it to distinguish it. But there was a huge benefit conveyed. Under those circumstances, the Department of the Interior blessed it and so on because it really was different than what the act contemplated and there was a benefit. Here, on the other hand, in order to get around the problem that the government clearly wants revenue. There's just no question. I mean, it quacks like a duck. It walks like a duck. It's a duck. It's a tax. There's just no question about that. The only question is whether there is a meaningful concession that is given to the tribes to make that a lawful compact. Isn't that really what we're talking about here today? We do not agree that it's a tax. Okay. What are we talking about then? Well, we're talking about revenue-sharing, which this Court in the Shoshone-Vanna case distinguished from a tax. Revenue-sharing is a negotiated tax. Are you going to argue that revenue-sharing in this context is not a tax? You've got to be kidding. No, we're not kidding. Revenue-sharing is a negotiated arrangement between the two sovereigns. It is not an imposition of the state's sovereignty upon the tribe, which is what Congress was concerned about when it passed IGRA. IGRA was passed in the context of prior decisions of the Supreme Court where states were …  It is not a tax. If you look at the revenue-sharing trust fund that was approved of by Coyote Valley, it's very similar to general fund revenue-sharing. In both instances, it's negotiated. There is no limit placed upon the use of those funds by the beneficiary tribes. It is, and I think perhaps most significant, is that it is a bargain for exchange for the sovereign foregoing the opportunity to participate. But in Coyote 1, Coyote 2, excuse me, the extra monies went to these funds that directly or indirectly benefited the tribes. The state got very little out of it. In this case, the state's asking that these monies go directly into the general fund for the general use of the state. That's right. Why is that revenue-sharing? That's a tax. Well, I think in the context of negotiations between sovereigns, it's not appropriate for one sovereign to dictate to the other sovereign how it ought to use its share of the revenue. Have you ever read Bury My Heart at Wounded Knee? I have, Your Honor. You ought to do that. The idea that the state of California can take this little Indian tribe and treat it as a sovereign is ridiculous. The reason that Congress passed this law was to avoid the imposition by powerful state governments of the very kind of thing that it seems you're trying to do here. They wanted to have a level playing field. There was to be no tax on it. There were certain things that the government could do. But I personally find it ludicrous that you're talking about mutual sovereignties here. This is not a fair characterization of what you're talking about here. Well, we have to live with the characterization that Congress and IGRA gave us, and it is very clear, both within IGRA and in the Senate report, that Congress is anticipating sovereign negotiations between the two tribes. That's what the negotiations are. Between the tribe? Between the tribe and the state, excuse me. This is the intent of the negotiation process. And understanding that IGRA doesn't expressly authorize revenue sharing, that is true. But nor does IGRA expressly contemplate that a state would change its gaming regime to benefit tribes and only tribes, which is what it did under this Court's decision. That's the Coyote 2 case where you had a very definite change. But you don't have that here. You have really offered these people nothing meaningful in exchange for what you're asking. Well, that is not true. You're asking for 95 percent of the revenue by your own experts' calculation, whereas they get 5 percent. The district court decision in this case appears to have misunderstood the role of the special distribution fund with respect to the Rincon Band. In its decision, it seems to believe that the special distribution fund revenues were consideration for X specificity. This tribe does not contribute to the SDF. It never has because it didn't conduct gaming prior to Proposition 1A. The revenue share ---- It couldn't have. It couldn't have. Could it? Until the constitution was amended, it couldn't have done it. No, a number of tribes did. A number of tribes did participate in gaming prior to the passage of Prop 1A. That was a topic of conversation in this Court's Rumsey case, and it was discussed in a background in Coyote Valley. Only the tribes that were conducting that gaming, which was uncompacted and in the states viewed as illegal, were required to contribute to the special distribution fund, which is just a mitigation fund. This tribe doesn't make any contributions to that fund. The amount of revenue that the states sought in negotiations with the tribe is roughly equivalent to what the tribe would contribute under the special distribution fund for that level of gaming devices were it contributing. And the approach ---- How does the tribe get out of it? Well, it had an extension of time. It had additional devices. Extension of time is almost meaningless. You'd have to change the constitution, would you not, for them to lose that right? Well, no. The compact, the 1999 compact, had a term of 20 years. If the compact had expired and the State and tribe were then required to negotiate over a new compact, I don't think anybody would question that the discussion would begin anew and the State and the tribe would be negotiating from their governmental interests again. This is essentially the approach that the Governor took when he engaged in negotiations in 2004. It's no secret that Governor Schwarzenegger had a very different view of the State's interests with respect to tribal gaming than Governor Davis did. Well, indeed, he campaigned, did he not, on the idea that Indian tribes should pay their fair share. He did. That sounds like the Democratic leader of the Senate. Well, this was his perspective. And he was elected by the people with that being part of his platform. And it wasn't just revenue sharing that he was concerned about. I guess my point, I'm not criticizing the Governor. I'm simply saying the Governor said, hey, if I'm elected, I'm going to get some tax from these people. I'm going to get some money from these people because they're getting to do this gaming and I want them to pay more. And that's what he's trying to do here, isn't it? That is an element of it. It is an element of it. Yes, it is. And we would concede that. But it's not a tax. And it is appropriate. Why is it not a tax? Because the state has never sought to impose its tax code on all tribal economic development. It doesn't have to be a tax code. It doesn't have to be a tax code. It hasn't sought to assert the authority of the Franchise Tax Board on all on-reservation economic activity. That's the kind of conduct that Congress was concerned about when it passed AGRA and was concerned about preventing. Counsel, I'd like to know how the terms that the state proposed to the Rincon Band compare with the terms that the state negotiated with the other tribes that were approved by the Secretary of Interior. So the rate, what is the effective rate on their marginal revenues, on the new revenues, on the new machines? So what's the rate that the state would collect? Fifteen percent on new machines. So the state is going to collect 15 percent. The tribe is entitled to the remaining 85 percent? Yes. There would be a share that would go to their manager. Which is Harris. Harris, yes. Okay. And that actually turns out to be quite a bit of their share. Yes. Okay. And that share is only on the marginal increase in the number of machines. Is that right? That's correct. And the number of machines is going from what to what? 1,600 to 2,500. 2,500. In one of the proposals. Okay. So the 15 percent does not apply to the first 1,600 machines. It only applies to 1,601 through number 2,500. That is correct. Okay. And how does that compare with the rate that the other tribes negotiated? Well, it was. They had more machines, didn't they? They had larger casinos. They had more machines. And the rate on the new machines, I don't believe it was a rate. In most cases, it was a set fee that would increase based upon the number of machines. So there was a scale. And there are considerable – there is considerable variation in the negotiations, in the compacts that resulted in those negotiations or from those negotiations. So it's not as if there was one set fee. So the 15 percent rate we cannot compare because there is no comparable 15 percent being charged to any other tribe. Is that correct? There is a range of percentages charged to other tribes. Okay. And what is the range? It would be between 10 percent going all the way up to 25 percent where a tribe is operating. Some tribes have a 25 percent marginal rate? It would be on devices between 6,000 and 7,000 devices, for example. All right. And on devices between 1,600 and 2,500, do you have a comparable rate for other tribes? Is there anybody else who is paying 15 percent on machine number 1,601 through machine number 2,500? I would suggest that if you worked out the fees per device on a percentage basis, the other tribes are all within the range of 15 percent probably. What are we to take from the fact that the Secretary of the Interior approved the compact with the other tribes? What legal effect, if any, does that signature have for approval? Well, clearly the Secretary's view is that revenue sharing for the general fund is permissible. In the context of a legal regime. Is it a type of Chevron deference? Is it conclusive on this Court? Is it persuasive? Is it nothing? It's not nothing. I think Chevron deference would be an appropriate standard to apply. What regulation are they construing? Chevron deference is pretty substantial. Right. Well, they are construing the compacts and the Secretary. That's a statute. This is a statute here we're talking about. That's true. Does the Secretary of the Interior get Chevron deference for construing a statute? That's true. There are no regulations implementing this. We don't call it Chevron deference. I think it would be entitled to substantial deference. I don't know of a case that discusses what level of deference the Secretary is entitled to. But the standard that the statute requires the Secretary to apply is to review the compacts and determine that they are legal. And in this case, the Secretary affirmatively approved all of these compacts. I'd like to ask you a question about the statute itself. As you know, 25 U.S. Code, Section 2710, and I'm looking at subpart 4. Yes. The exception in the negotiation provisions, and it specifically says that except for any assessments that may agree to under Paragraph 3C-I, which has to do with assessments by the state of such activities in such amounts as are necessary, to defray the cost of regulating such activity. Nothing in this section shall be interpreted as conferring upon a state or any of its political subdivisions authority to impose any tax, fee, charge, or other assessment on an Indian tribe or upon any person or entity authorized by an Indian tribe to engage in a Class III activity. Why is not what the state is asking in this instance a direct violation of that section? It is the distinction between the imposition of a tax and a negotiated revenue sharing, which we think is very meaningful. That's just semantics. No, it's not, Your Honor. Here, if it were just semantics, if the State truly were limited to the seven topics of negotiation provided in 2710d-3, then the State never would have amended its constitution. As a part of the Compact Negotiations in 19- You're going back to the Coyote 2 thing. Coyote 2 is different because there you gave the tribes a very big consideration. You let them engage in the Class III gambling, which they could not do before. Everybody agrees that our Court has blessed that point. But you're not talking about that here. That the constitution has been amended, and now you're asking to impose what by, I think, any definition a third grader could look at this and say, this is a tax. Well, it's a 15 percent revenue share, Your Honor. Now, is it the case, then- Do you pay a revenue share with your personal income tax? I've never had the opportunity to negotiate my taxes. But it's still, whether you have a chance to negotiate it or not, the fact is you pay it, and if you want to call it revenue sharing, you can. Well, I pay it because the State or the taxing authority, the State or the federal government, is a sovereign over me and can impose, with its legislative authority, that tax. The State is not sovereign over the tribe. Right, and the Congress has said you can talk to the Indian tribes about what you want to do, but you can't impose a tax or an assessment or a charge or a fee in order for them to engage in Class III activity. But we may negotiate it in exchange for exclusivity. And when the tribe asks for additional machines or additional time, it is expanding the value of the exclusivity in the original compact. The State took the position that IGRA doesn't contemplate amendments to contract compacts, IGRA doesn't give jurisdiction to this Court for a bad faith dispute over an amendment, only compacts. So the Governor is negotiating a new agreement when the tribe approaches it and requests negotiations, more time, substantially more devices. This Governor has a very different policy view of what the State's interests are in these negotiations, and it is incumbent upon him to advance that interest. We respect the Governor's right to do that. What he cannot do is violate federal law. That's the question before us. That is. Okay. I see my time is up. Yes. Thank you very much. Thank you. Let's hear from the tribes. Good afternoon, Your Honor. I'm Scott Crowell. It's my honor and privilege to be here on behalf of the Ring-Con Band. With me in the courtroom today are three members of the Tribal Council, including Chairman Bo Mazzetti. I want to start by correcting the record. It is not true that the State's offer or insistence for tribal revenue sharing here is 15 percent of the revenue for those additional machines that the tribe may be able to operate. The State's demand, and demand is the right word, is that the tribe pay 15 percent on gross revenue, starting with machine one. So that includes all of the machines that exist under the Prop 1A compacts, not just new machines. That's simply an incorrect statement of the facts and the record that my counsel made here. Can you clarify something for me, Counsel? I read in the record, let's see if I can find it here. Oh, here it is. I read that the State's expert estimated that Ring-Con would receive $2 million in additional revenues from the amendments offered, whereas California would reap approximately $38 million. Is that correct? That's correct. That's the State's. That's Professor William Deacon, the State's own expert. Now, can you clarify whether the 2 million, is that your net? Is that your net profits? Now, what Professor Edenton said is that if this compact were to go through the State's proposal, it would generate $40 million in new revenue. Of that $40 million, and I'm assuming that that's a gross number, of that $40 million, $38 million would be paid to the State under the formula of the State's proposal. My understanding was that the Ring-Con band would get substantially more than that, but it had to pay fees to Harrah's for managing the casinos, and so its net would be substantially reduced by that cost. Well, it's true that the Ring-Con has an agreement with Harrah's and pays a percentage of the net. The meaningful value that comes to the tribe under that agreement is the best management in the industry, hands-on, the branding of the Harrah's name, the best marketing program in the industry. The tribe benefits from Harrah's. In fact, it's questionable as to whether we could even survive in the remote location that we are if we didn't have a management agreement with that, like Harrah's. The meaningful value of the State's $38 million under their own expert, I'm at a loss. I'd appreciate your clarification of your answer to Judge Bybee's question, because I have the same question he does. He and I are both trying to understand when you net everything out after the Harrah's cost and so on, if there are a hypothetical $40 million of new revenues, i.e. revenues that did not previously exist. Once that's done, what's the distillate under the expert's calculation as to what the tribe would get, if they ever got to that, and how much the State would get? Is that the $2 million, $38 million that we talked about earlier? That's the $2 million, $38 million. That 15% number is based on gross revenue. Every dollar that goes in, there's no net calculation. Our agreement with Harrah's, in sharp contrast to that, is mandated by federal law, is based on net revenue. Okay, but I'm still a little confused. Obviously, if the government's getting $38 million, that's not 15% of $40 million. So we're actually talking about two different things. The State is going to get 15% of the gross revenues. The tribe will get 85% of the gross revenues. Is that correct? Well, yes, on all machines. Right, on all machines. Okay, so you're going to get 85%. You're going to get to keep 85% of the revenues. Of the gross. Of the gross. Now, from that, you are going to pay a substantial fee to Harrah's for managing your operations. Is that correct? Well, out of net, not out of gross. It's not, you know, I have to go back and look at what Edington studied to say, you know, what is the net revenue that's created there? The way Edington did his analysis, and this, again, this is the State's own expert, is that if we take 15% of the gross revenue of all the devices in the operation and And how much would that be? How much is 15% that goes to the State? Is that 38 million? Is that where we get the 38 million figure from? Yes. Okay, so 15% of the tribe's gross revenues there will amount to $38 million. Well, under Edington's study, it would amount to $40 million. You're confusing me. I thought you said that the $40 million was of new revenues. The 15% you said was on gross revenues from machine one, which is not just new revenues. It's revenues that previously existed. How much was being earned before, if you assume that there's no new proposal from the State, what's our base? What are we starting from in terms of revenues? I don't have those numbers in front of me. For hypothetical purposes, it's, say, $200 million. Okay, all right. So we understand it's just a hypothetical. So we've got $200 million to start with. Okay, and then you have to pay Harrah's from that and so on. Well, again, we only pay Harrah's out of net. Out of the net. So if there's $200 million in gross and there's $150 million in net operating costs, of that remaining 50 million, Harrah's gets a percentage out of that, which I think is currently 17%. Okay, what I'm focused on, and I assume Judge Bivey as well, is now that we have that established, what we're really looking at is the value of what the State has proposed going forward, because that's really a function of whether you comply with Coyote 2. Is there a meaningful consideration given? You have argued in your briefs that it really isn't meaningful because essentially you had it there before. They didn't really give you anything new. So I'm trying to understand, I think Judge Bivey's trying to understand, the expert from the State concedes that RENCON would get $2 million of additional revenues, the State gets 38 million. I assume that is from new revenues past the $200 million gross that we talked about before, right? Correct. Okay. And the $2 million that you would get under the professor's calculation, part of that would go, is that gross revenue to you, new gross revenue, or is that net revenue? That would be new net revenue. Okay, so that would be shared with Herod, which is a whole separate issue. Right. But the State, the $38 million in this case would go directly to the State's general fund. Is that correct? Correct. It does not go into any of these subcategories of funds for the benefit of tribes, as happened in Coyote 2. Right. Indeed, the State insisted that it be general fund revenue. Okay, so that is your basis for claiming that, unlike what you had before, this is a tax. This is going right into the State's general revenue funds. It can be used for anything. It doesn't have to have anything whatsoever to do with RENCON or any other Indian tribe. Is that correct? Correct. And I think it's also important to contrast that to RENCON's offer. They point out that the tribe doesn't pay anything into the current SDF, and that's the way the State wrote the compact as it applies. RENCON's offer says we will take these new fees that we will pay to the State, and they will be earmarked for defraying regulatory costs and mitigating impacts. And that's directly contemplated by the Act, is it not? It's contemplated by the Act. It's consistent with Coyote 2. In fact, you know, it's interesting to look at the district court provision because there was a dispute over the way the act, the compact reads, is there's all these different directly related costs that can be used, that SDF funds can be used for, and then other purposes identified the legislature. And the district court said, well, I'm interpreting that as to make sure that it must be directly related to gaming because if it's not, then it becomes an illegal tax prohibited by IGRA. Did the band make any offer to the State to pay anything into the general fund, or are you only offering to pay into the SDF? No, we didn't identify whether it be SDF. We identified it as a percentage or an amount per machine or something. And what was the band's last offer? Our proposal was three parts. It was we would pay 4,350 per device for devices 1,601 to 2,000. We would pay 6,000 per device for devices 2,001 to 2,500. And we even- 4,350. That's 4,350. 4,350. Okay. Per year. Per device per year. And then we would pay 6,000 per device per year for devices from 2,001 to 2,500. Okay. And we included a re-opener that if the State could establish that those fees were inadequate for defraying regulatory costs or mitigating impacts, that we would negotiate a higher fee. Okay. And how much did that work out to a year that you offered? We could do the math. I don't have a calculator with me. I don't have it in front of me. I believe it's $4 million or $5 million. Okay. So you're offering 4 to 5 million. The State wants 38 million. You weren't distinguishing whether the 4 to 5 million dollars went into the general revenue fund or whether it went to something else. So as far as you're concerned- Oh, no. We were distinguishing it. We say this money, the money that we're offering must be used consistent with IGRA. It must go to defraying regulatory costs or mitigating impacts. So it had to go to the SDF or something else. Right. Right. Does that include the Revenue Sharing Trust Fund? The proposal did not. Okay. I do take issue with counsel's characterization of the Revenue Sharing Trust Fund being the same thing as general fund revenue going to the State. If California had demanded $38 million and it said it would go to the SDF, would that still make its offer a tax in your view? Well, if they could justify that the $38 million would go to defraying regulatory costs or mitigating impacts, we have asked the State throughout the negotiations again and again to quantify just what does it cost, just what does it cost you to regulate us, just what does it cost you to mitigate those impacts. And the State said, we don't even need to get into that. You don't tell us how to spend this money. It's going into the general fund for us to use for whatever purpose we see fit. We wanted to engage in exactly that discussion. But in any event, under the terms of IGRA, since those costs would have to be used to defray regulatory activity, it couldn't just go into a general fund. It would have to be allocated to defray those costs identified in some way, right? Well, that's our position. You know, if the State could track the funds through the general fund, you know, that's, again, that's a hypothetical that isn't in the record and a discussion that we wanted to engage the State with, which they would not do. I also wanted to make a correction of the characterization regarding these Department of Interior approved compacts. Of the Schwarzenegger compacts, only the first five were affirmatively approved. And in contrast to the compacts offered here, where it's you're going to take 15 percent of your net revenue and pay it to the State general fund, there it was more consistent with the Prop 1A compacts to where you had a per device fee that increased in graduation. You had a tribe, five tribes, and the State go shoulder-to-shoulder with the Department of Interior saying, please approve these compacts, and they made representations as to what that meant. They made a representation that those graduated fees constituted less than 10 percent of the net. Not a true representation, but a representation they made nevertheless that Interior relied upon. They made the representation that they were getting some kind of new exclusivity because they were going to be able to go into State court and enjoin any law allowing for non-Indian gaming. A ludicrous proposition that you were going to negate the exercise of the will of the people of the State Constitution, which is the only way the exclusivity that currently exists in California constitutional law could change. Interior wasn't in a position to say that's true or not true. And Shoshone-Bannock, this Court already said in Shoshone-Bannock, it's one thing for a tribe and a State to agree upon a fee. It's another thing entirely for the State to demand that fee out of the tribe in exchange for the compacting process to go forward. So we don't believe any deference should be given to those Interior compacts. And every compact submitted to Interior since, including those that have these percentage fees, were not affirmatively approved. They went through the 45- or 60-day approval process without being disapproved, meaning that they're, quote, deemed approved, which Interior takes the position that we're not making any kind of statement regarding the legality or illegality of the provision stated therein. There should be no deference to Interior's position here. Anything further? I believe I'm down to six seconds. Okay. This has been on the briefs. All right. Thank you very much. Thank you, Mr. Crowell, for your argument. Counsel, we took up your time. I do have some additional questions for you, so I would like you to take the podium. Thank you, Judge. And first, I would like you to respond to Mr. Crowell's opening point that it was a clarification that the 15 percent figure was simply not true. And see if you can bring some clarity as to what 15 percent refers to and where we get the 2 million and the 38 million figures. My understanding of the State's last proposal was 15 percent on new devices, 10 percent on previous devices. There was an earlier proposal. So 15 percent on the new devices and 10 percent on the old. Do you have a citation of the record? I assume this is in a letter from the State to the band. It's on ‑‑ I believe that would begin on page 1031 of the record. That is the ‑‑ This is the excerpt of the record? Excerpt of the record, yes. That would be Andrew Hoek's letter to the Tribe. All right. So you've got 15 percent. You claim it's 15 percent on the new devices, 10 percent on the old devices. How do we get the 2 million, 38 million? Because obviously 38 million out of 40 million is not 15 percent. 15 percent is on ‑‑ that is a calculation based upon the gross gaming revenue of the Tribe. The 15 percent is the duty that ‑‑ I'm sorry, but that is 15 percent of the gross revenue. That's correct. Okay. So how do we get the 2 and the 38? That is ‑‑ the 2 and the 38. Where does the pot of $40 million come from? That is on the marginal increase in revenue between what was gained, generated by the 1999 compact and what would have been generated under the compact offered at the end of 2006. Okay. So of the new $40 million that would be generated, 38 would go to the state and 2 would go to the Tribe. Okay. Now, why the disparity? I mean, why ‑‑ you're not asking for, let's see, 2, that would be 95 percent of their revenues, right? Is that a demand? Did you demand 95 percent of their marginal increase in their revenues or is there something else going on? Well, this is really what gets to the crux of the problem. And, again, I described earlier that the Governor was taking a holistic approach at this compact and not stove piping. Holistic? A holistic approach. That's an interesting way to put it. Well, he was considering the compact as an entire package, not just looking at the market. What do you mean by holistic? Well, I mean that under the 99 compact, the Tribe generated $59 million in profit and the state received nothing in exchange for its ‑‑ nothing to the general fund in exchange for its exclusivity. We look at the ‑‑ clearly there is, I think, a disparity in the ‑‑ They want to kind of make up for lost ‑‑ That's right. That's right. The Governor's perspective was that exclusivity is valuable and that should be reflected in the compact. We screwed it up last time, we're going to make it up. Well, that is one way of looking at it. I mean, that's true. I think it is the way to look at it. It is one way of looking at it. But the Tribe wanted negotiations. The Tribe wanted more machines. The Tribe wanted an extension of time. That extends the exclusivity out in time and it was the Governor's view that it's incumbent upon him to renegotiate the terms of the compact. But because we got to this fundamental impasse over whether the state is entitled to revenue sharing, we never really got to have negotiations ripen. We have an offer from the state, but the response from the Tribe is $1 of general fund revenue sharing is too much. So this offer, although the state has been hooked on it, has never gone through the crucible of real negotiations. The state concedes that the Tribe never offered to give the state general revenue funds. That's true. Okay. Can you go back and explain now the 40 and the 38 and the 2, where that comes from? The 40 comes from the, is a calculation, an estimate of the marginal benefit of the new compact over the old compact. Okay. So how is it that the state, that the Tribe is only going to end up with 5% and the government is going to end up with 95% because clearly that doesn't jive with the percentages that you described earlier? Well, it's because of the 10% revenue share on the first 1,600 devices. There was no revenue. The Tribe does not contribute any revenue share to the state on its first 1,600 devices under the 1999 compacts. Okay. So in calculating the 37 million, 38 million, 37.9 million that the state would receive under the new compact, that is also derived from the original 1,600 devices, not just from the new devices. I see. Okay. I would like to comment, if I may, on the notion of exclusivity sort of persisting under Proposition 1A. Under the Tribe's conception of the effect of Proposition 1A, the state really is in a catch-22 position. It could not have requested revenue sharing when it amended its compact. The people could not have said any tribes that want to participate in casino-style gaming may do so or are permitted to do so if they provide 25% revenue sharing or 15% revenue sharing. That would not have been negotiations and clearly would have violated IGRA. Now, so what is the state's option? It is only to pursue revenue sharing in the compact, and that's what it has sought to do in this case. Kennedy, what are you trying to do indirectly, what you don't think you can do directly? No. No. The reason that we could not seek revenue sharing in the Constitution is not that it's a tax. Well, that would be, actually, perhaps more of an imposition, but it would not be. It's a tax if you do it directly, but not if you do it indirectly. No, no, no. The problem with that is that it's not negotiation, and IGRA contemplates negotiation between the sovereigns. And I understand, Judge, you don't like that term, but that's what IGRA provides in a review of the Senate report. I'm fine with the law. Okay. Well, then, we're left with these negotiations. The only way that the State can get value for the extraordinary benefit that the people conferred upon the tribes by granting this exclusivity subject to the compact is through the compact negotiation. But the reality is when we, when the three of us meet and confer, I gather you are conceding the fact that what we have to weigh is whether the new consideration being offered by the State in this negotiation is meaningful enough to meet the requirements of Coyote 2. And if it does not, then whether that constitutes a violation of IGRA and, therefore, constitutes bad-faith negotiations. Is that correct? Well, no, it's not correct. I think there does need to be any – Well, in any contract, there does need to be offer, acceptance, and consideration. But this is a little different. We're dealing with IGRA. And the way the Congress set it up, knowing the relative inequality between states and Indian tribes, they provided parameters. It's almost like a labor negotiation in a way, but not quite. And they said that you can't ask for a tax. And if you do, it constitutes bad faith. It sets up the rules, and it sets up a baseball negotiation clause, basically, if you don't comply the other way. Except IGRA doesn't actually say that. No, I didn't say baseball, of course. That's my term. No, it didn't say if you demand taxation, that's bad-faith negotiation. What it said was – and, again, this goes to the context – is that a demand for direct taxation or an effort to effect direct taxation on tribes is evidence of bad faith. It's not dispositive. And that's one of the errors in this Court that the district court made below. It's not dispositive of bad faith. And in the overarching context of these negotiations, of the States' demonstrated willingness to reach agreement, of secretarial letters approving revenue sharing, and the fact that this proposal that we're stuck on here has never really been negotiated because the tribe would never concede that the State was allowed $1 of revenue sharing. Yeah, right. It's never been negotiated. The State says if you don't give us money for the general fund, we're not going to talk to you, basically. Well, I think there should have been at least – Our view is that revenue sharing is an appropriate topic of discussion. Revenue sharing where the money goes to the general fund. Yes, to the general fund, certainly. When we are met with accusations of bad faith and illegality just at the mere suggestion of revenue sharing, it deconstructs negotiations. Understand, counsel, this is not what we're saying. This is what the Congress said. The Congress built that into IGRA. It's our job to construe, based upon the facts of this case, whether that has happened. We certainly have no ill will toward the governor. We have no ill will toward the State. The reality is we're just trying to construe what happened here. But on the other hand, I'm almost reminded of the taming of the shrew. It looks like we're looking at the sun and calling it the moon and the moon and the sun and all that sort of thing because a tax is a tax. And when you ask somebody for revenues that go into the general fund, it's awfully hard to understand how that can be taken as anything other than what the governor said in his campaign that he was going to do. He wanted to negotiate a fair share. That's right, a fair share. That's a tax concept. Well, except that there's no imposition of the State's sovereignty over the tribe. No, I understand that. They just want the money. That's correct. Right. Okay. Thank you, counsel. Thank you. The case is submitted. We thank both counsel for the argument. That will bring us to the last case on today's calendar, which is United Steel Paper and Forestry v. ConocoPhillips Company.
judges: Nelson T. G., Bybee, Smith M.